QUINN (UNITED STATES v.). See Case No. 16,110.

QUINTARD (HEATON v.). See Case No. 6,311.

QUINTARD (WEBB v.). See Case No. 17,324.

---

## Case No. 11,517.

### The QUINTERO.

[1 Lowell, 38.] [1]

District Court, D. Massachusetts. Jan., 1866.

SEAMEN—ARTICLES—PAROL EVIDENCE — CLAUSES NOT EXPLAINED—FORFEITURE—WAGES— IN WHAT MONEY RECKONED.

1. Where seamen shipped at Valparaiso on board a Chilian vessel and signed articles for a voyage to Boston and back to Valparaiso, they cannot by parol evidence vary the voyage shown in the articles, if the contract in this respect was fully explained to them before they signed it.

2. But they can avoid a clause in the articles which was not clearly explained to them, and which undertakes to forfeit all their wages and property if they should be absent from the ship

1 [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

for forty-eight hours without the express permission of the master.

[Cited in The Samuel Ober, 15 Fed. 622.]

3. Where, in such a case, the seamen left the vessel on her arrival in Boston, under a claim of right, and in ignorance of the penal clause of the articles; and upon learning that the master insisted on their return, offered to come on board and serve again, but were refused permission, and their absence had worked no injury to the owners, held, they might recover their full wages to Boston.

4. The wages should be reckoned in the money of the United States, the contract being for somany dollars payable here.

In admiralty.

W. J. Forsaith, for libellants.

J. C. Dodge, for claimants.

LOWELL, District Judge. This is a libel by several seamen for wages. The ship Quintero, built and owned by American citizens, who have a branch house in Valparaiso, is navigated under a Chilian register for reasons arising out of the late war. The libellants allege that they shipped in this vessel in the month of January, 1865, at Valparaiso, for a voyage to Boston; that the ship arrived here on or about the 11th of June, and earned freight, and that they well and faithfully performed their duties. The answer by the master sets up a voyage from Valparaiso to Boston and back to Valparaiso, and that by the articles the crew are to forfeit all their wages, and property for the benefit of the Charity Hospital, if they are absent for fortyeight hours without the express permission of the master, and that the libellants left the vessel at Boston without that express permission and so have forfeited their wages.

Soon after the vessel was safely moored in Boston the libellants went on shore, taking their clothes with them; they went back the next day, and for several succeeding days, to see the master and ask for their wages. The master referred them to the owners, who sent them back to the master, who then advised them to see the Chilian consul, who refused to interfere in any way, because they were not citizens of Chili. They continued to besiege the master daily, and on one occasion, some days after the libellants had first left the ship, one of them, in the presence of the rest, offered to the master to return on board and perform ship's duty, but the master refused to receive him back to duty or permit him to come on board the vessel.

The articles are in Spanish, and state the voyage and penalty for absence without leave, as they are alleged in the answer. In fact some of the crew are inhabitants of Valparaiso, and there is no doubt that they intended to return in the vessel. The libellants are all either Americans, or familiar with the English language, and all are ignorant of Spanish. They were engaged by a shipping master, and they all swear that the oral undertaking was for a voyage to Boston. And the first question is whether

this evidence can be received to control the written contract.

There are many English decisions which establish that ships' articles are conclusive evidence of the voyage and the rate of wages agreed for. But these are founded upon the express provisions of the St. 2 Geo. II. c. 36, and those which have followed it. See The Minerva, 1 Hagg. Adm. 354; The Prince Frederick, 2 Hagg. Adm. 394. On the other hand, it has been decided that our statutes make the written articles conclusive for certain purposes only; and that in a suit in the admiralty, evidence may always be given that the voyage is wrongly described in them, for the reason that the law makes void articles which do not truly state the voyage; and from the necessity of the case their invalidity must be shown by evidence outside of the articles themselves. Page v. Sheffield [Case No. 10,667].

The present case is not governed by either of these classes of authorities, nor do they afford much analogy for its decision, because here both the vessel and the contract are Chilian, and the law of Chili upon this subject has not been given in evidence. The rights and duties of these parties must therefore be decided by the general maritime law, and the rules of evidence in their ascertainment will be such as this court is accustomed to follow in such cases, where no statute regulates them.

Now whatever may be the strict rule of the common law, I am by no means prepared to say that in this court a sailor, unable from any cause to read the contract which he has subscribed, might not be permitted to show that it differed from his oral engagement, upon clear proof that the written contract had not been read or explained to him, even without the element of positive fraud which probably induced the admission of such evidence in Wope v. Hemenway [Case No. 18,042]. But I am not satisfied that the libellants were ignorant of the voyage described in the articles. After a careful examination of the conflicting evidence, I am inclined to believe, though with some hesitation, that the voyage was explained in the hearing of the crew when they were called up to sign the articles; and that these libellants probably relied upon the undertaking of the shipping master that they should be discharged in Boston notwithstanding they might sign a contract binding them to a longer service. And I cannot think it safe to allow them now to engraft this condition upon the contract to which they then assented, in default of evidence of fraud.

When we come to consider the conduct of the men at Boston, a different question arises. There is no doubt that they performed their duty faithfully, and earned wages which they are entitled to receive, unless forfeited by subsequent misconduct. The only misconduct put in issue by the plead-

ings is an absence without leave, contrary to the shipping articles; but as the general question of desertion was argued, and an amendment of the answer would be readily granted, I shall consider the case in both aspects.

And I cannot for a moment doubt that the clause of the articles forfeiting all the wages and property of the crew upon an unauthorized absence of forty-eight hours is void. A court of admiralty will disregard such parts of any shipping contract as purport to limit the rights of seamen; unless, as some authorities say, it is clearly shown that the matter was fully and clearly explained to the men and freely assented to by them, with an additional compensation as a consideration for the surrender of part of their rights. Now this contract undertakes to establish a fixed arbitrary rule, applicable to all cases of absence, whatever the time, place, and circumstances, which may show much or little injury to the voyage, or excuse or extenuate the conduct of the crew, and without reference to the amount of the loss of wages and property to which it may subject them. Now these circumstances are proper to be considered, and are considered by courts of admiralty, and in recent times cases of total forfeiture of wages are comparatively rare. Swain v. Howland [Case No. 13,660]. It is not for the master to assume to abridge the power of the courts in this particular in his shipping contract. It is true that our statute has established a like arbitrary rule of forfeiture for forty-eight hours unauthorized absence; but it has provided for a precise and contemporaneous entry in the log-book as the necessary evidence of the facts. The courts have always held this statute to be highly penal, and have required it to be strictly and accurately followed. Else they will examine and decide the case upon its merits. Cloutman v. Tunison [Id. 2,907]; The Phœbe v. Dignum [Id. 11,110]; The Rovena [Id. 12,090].

In this case the evidence does not show that this highly penal clause was ever read to the libellants, or any of them, or explained to them. I believe one witness says that the articles were read over in English as well as Spanish; but the weight of the evidence is that only some explanation was made of them by the captain of the port, himself, I suppose, a Chilian, and not one witness says that this part was so explained, though I doubt very much whether the mere explanation would have saved it. If we look upon it as a penalty to be chancered, which is as much as a court of admiralty could be expected to do for it, the result is much the same, and the case is left to the operation of the general law.

The only question, therefore, is whether the conduct of these men, in Boston, was such as to work a forfeiture of their wages, or a part of them, according to the general principles of law; and, upon this point, we

naturally look first to the evidence of the master. He says that he discharged and paid some seamen who had signed the articles, and would have done as much for these men if they had asked his leave before quitting the ship; nay, that he would have done so as it was, but that the Chilian consul forbade it. It seems that he had reported them as deserters to the consul within a few days of the vessel's arrival, and, for aught that appears, before he had explained to one of them the effect upon their wages and property which he supposed would result from their conduct. I must be permitted to doubt whether the excellent and prudent merchant of this town who holds the consular office in question, ever assumed the jurisdiction to decide this case, at the instance of the master, which he had refused when claimed by the crew. If he did, his decision was made upon an ex parte hearing, and was probably founded upon some state of facts or of the law of Chili not in evidence here.

Upon the whole evidence, it seems the crew were acting under a claim of right, and it was the duty of the master to reason with and counsel them; but in fact they may, very probably, have been misled by his conduct, in discharging other men similarly situated to them, and in referring them to the owners and to the consul, thus implying that the difficulty was open to arrangement. This being so, the master had no right, when the crew, upon the precise controversy being understood, and, for aught that appears, as soon as it was understood, offered to return to duty, to turn round upon them with a forfeiture which he had all along intended to rely upon, as is shown by his early report of them as deserters to the consul. The evidence further tends to prove that the master did not really want the services of these men. The vessel has lain here ever since her arrival some months ago; and the owners have greatly gained by the dismissal of part of the crew. Whether this result was anticipated or not, I cannot say; but the appearance is, that, for some reason, the master was not desirous to retain them, though he was quite willing to make some money out of them, for what is, I doubt not, a meritorious charity at Valparaiso.

Upon the question of the intent of the crew, in their alleged act of desertion, the oral evidence may properly be looked into. And I decide that they had not the intent to desert a known duty; and that it was, under the circumstances of this case, incumbent on the master to take them back when they offered to return; and that the owners have suffered no damage by the conduct of the crew, but have gained by it. They are to have their wages to the time of the vessel's arrival in Boston.

Upon the amount to be recovered some question was raised. The contract was made in Chili, and an inference is said to arise from that circumstance that the crew were to be paid in Chilian dollars. But the contract is merely for dollars; and, upon the aspect the case has assumed, it is for dollars payable here, and the presumption must be that the place of performance of the contract is to be looked to in this particular. And whether the decree be strictly for wages or for damages in the nature of wages, it should be made up in our money. Decree for the libellants.